Hallroads. Mr. Daly? Yes, good morning. Good morning. Just a little note. We're going to run short on time this morning, so we're going to pay close attention to the clock, so please budget your time accordingly. Are you reserving time? Yes, three minutes, please. Yes, sir. Let me say initially, it is my position that the applicable theory that we're going to look at today is the one that we're going to look at today. We're going to look at the theory that I'm proceeding on is the entwinement case. You have explicitly limited yourself to pervasive entwinement by virtue of a stipulation at the district court, correct? Yes, and by what I believe I argued here as set forth in my summary of legal argument. Yes, but in your response and brief to the summary judgment motion before the district court, I believe you explicitly limited your argument to pervasive entwinement. Yes, so nothing was lost. Although I raised that argument in prior motions for a preliminary injunction and in regard to a summary judgment initially filed by the defense. Yes, so how was the authority pervasively entwined with the operation of the service facility? Yes, as I understand the test, I have to demonstrate that there's an entwinement with the policies, the management, and the control of this facility. I ask that the focus be on the particular facility. And so for there to be pervasive entwinement, you would agree, would you not, that a mere government lessor private lease arrangement would not by itself be enough? Under the current law, yes. It was enough in Burden, but Burden no longer applies. All right, so what else do you have besides landlord-tenant relationship? Okay, first there's the policy. A comedian once said something which is actually very true, that the highest honor New Jersey bestows upon a citizen is to have a rest area on the New Jersey turnpike named after them. That, in Pennsylvania, is the highest honor bestowed upon a politician who has somehow evaded conviction or had a conviction overturned. I have an example. New Jersey's not far behind. Oh, no, you lead, I think. Now the policy is that these facilities give the appearance or these facilities are a statement of the government policies. You walk in the door, there's a picture. Do you really think that perception is an adequate and sufficient basis to determine state action? I do not think that by standing alone it is. Are there cases that set forth any kind of test for perception? I know you've argued perception in your briefs, but I'm struggling to find out where in the jurisprudence there is any test of perception. Are we talking about an objective test? Are we talking about a subjective test? Because I've found nothing to support the existence of such a test. Well, there's the opinion regarding the airport where there was a discussion whether patrons would perceive that the materials that were being sold were a statement of the government. You're talking about the Gannett case? Yes. But there's no test laid down in that opinion, is there? No, there isn't. However, that factor is discussed, so the court obviously took it into consideration, although it didn't set forth the test. Does the authority have any hand in the day-to-day operations of HOST? Yes. Why? Well, first of all, they have a booth there that they set up, and they give out information in the booth at the Farley Plaza. How does that impact on policy, management, or control? Well, as to management and control, it demonstrates that the lobby area where the communicative information and materials is provided, the state has control over it. There's also a contractual provision that in the contract between HOST and the vendor sets out the brochures. That contract, first it states that HOST is acting as the agent of the landlord, and the landlord is the authority. There's no say in the placement of brochures or marketing materials, is there? Well, if we reduce the scope of the analysis to brochures, no, there is not. Because the lessee can't convey to anybody else something it doesn't have, correct? So the authority would have to convey to HOST some power, property, interest that it was then able to convey or sublease to someone else. Well, I agree with that. However, I believe that any contracts that HOST executes sort of like subleases with the vendor for the racks and things, that those require the approval of the authority. Yeah, but even if they don't, it would seem to me that a fair inference is that when HOST puts something in a contract with the vendor, that requires the vendor to make available a certain number of slots for information to be purveyed by the authority. Who made that decision? In the contract between HOST and the vendor. CMT. Yes. But the state was not a party to that contract. So this is a unilateral decision of HMS HOST, isn't it? Well, I think it's a fair inference that they wouldn't be putting that in unless the authority wanted it. Let me get to this point because I wanted to ask you a question regarding Brentwood. And this is a statement of Justice Souter in Brentwood. He said state action may be found if, though only if, there is a close nexus between the state and the challenged action. In other words, between the authority, in this case, between the authority and the removal of the brochures. But I don't see that close nexus. Do you? I see it in terms of the communications that are there.  Physically, I see the close nexus. The state did not physically remove, did not tell anybody to remove, did not direct anybody to remove the brochures. That would serve as a close nexus. Nor did the authority acting as the state, as far as I can tell from the record, suggest to the authority anything with respect to what it could or should display or how it should do so. Isn't that correct? Excuse me. Is there anything in the record to suggest that the authority provided any kind of guidance or suggestions to host concerning the types of brochures or marketing materials it could set out at the plaza? No. There's no memorandum. Let me follow up on that. What, if anything, did the state do with respect to placing the brochures in the host area or removing the brochures? Well, they provided a host. My position is that the area where the brochures are placed is controlled by both host and the state. How is it controlled by the state? Because they go in and they put in there whatever they want. The state? The state, the authority. Is there any evidence that they did that? Well, yes. There is notices of the meetings of the authority that are posted in there. They would have to be, those notices would have to be transferred to host or the authority itself goes and puts them up. What is the effect or impact of that posting on anything having to do with the day-to-day operations of the plaza? The effect is that it's not being operated as the lessee doing its business just by itself. In Brentwood, you're familiar with Brentwood, I assume. Yes. There was an economic relationship between the parking authority and the restaurant that was located in the parking area. Burden. Say again? Brentwood. I stand corrected. Now, just to draw a comparison, there was no economic relationship here between the authority and the service center, was there? Oh, yes. They divided the profits. Who did? The lease said that the authority got a percentage of the funds and profits that host received from operating the rest area. That's the lease. There was a basic rent and then the rent was lost. Over and above that, there was a percentage of the profits. The profits were operating the service area, but with regard to the brochures, there was a profit that host was receiving, right? But that was between CMT and HMS Host. Well, I would assume that that was profit derived from the operation of the service area so that the state would be receiving a percentage of that, too. I think that my recollection of the lease was that all profits that host derived, net profits that it derived. But there wouldn't be any profit to the authority in this case, would there be, by the challenge section? After all, the brochures are being removed, not placed there. So there wouldn't be any profit by the challenge section in this case, by the authority? Well, considering the content of the brochures, the reason that they were removed, I take the position that it's a very reasonable inference, is you wouldn't have removed them if you didn't feel that certain customers might not like them and therefore would not use host services. So I believe that the profit motive was what came into play here for removing the brochures. You didn't like, you know, that you got a coupon for a free lap dance. Your time is up, Mr. Daley. Okay, thank you. We'll get you back on, Roberto. Thank you. Thank you. Ms. Bledsoe. May it please the Court, Catherine Bledsoe on behalf of the Apple Lease. I am assuming from the Court's questions and Mr. Daley's responses that the Court will not consider his argument that there's state action under the Burton symbiotic relationship test or the public function test that he raises for the first time in his reply brief by citing West v. Atkins. Could you describe the economic relationship that the authority has with HMS Host and which Host has with CTM? Certainly. It is a variation of a standard landlord-tenant relationship. I understand that's the basic, yes. With regard to their presence there and with regard to the brochures? Yes. Host enters into long-term leases with the authorities and pays the authorities as rent the greater of a stated annual rent or a percentage of the gross profits from the operation of the service. Whichever is higher. Whichever is higher. And that includes the brochures. And that does not have anything to do with the brochures except to the extent. But HMS Host does receive money for the placement of the brochures. That's correct, pursuant to its contract with CMT. Does that money somehow travel to the authorities' accounts? Well, to the extent it contributes to the profits that Host profits from the operation of the service centers and those profits in gross are greater than the stated annual rent in the lease agreement. However, even if there is some flow of money back to the authorities from the operation of the service clauses, that is not sufficient to constitute state action, as this Court made clear in the Crisman case. As you recall in that case, there was a harness racing facility that was run by Dover Downs. It was a private corporation. It was licensed by the state. Well, that was clearer because it was a private entity that engaged in the challenge conduct. That's correct, as is Host. And in that case, the private entity did share profits from the state lottery and video lottery and from the harness racing with the state. But this Court found that was not sufficient to constitute state action or to convert the private entity's conduct into state action. Let's look not only at revenue and profit but at personnel. Do any Host employees have any role in the operation or the conduct of business of the authority or vice versa? No, there is no connection. Anything in the record to that? Nothing in the record. In fact, I think the evidence is undisputed that the authorities play no role in the day-to-day operation and maintenance of the service clauses. What's your position with respect to the role of perception by members of the public? Yes, I think the Court has made it very clear that entwinement has to be actual entwinement of the government in the policies, management, or control of the entity engaged in the complaint of conduct and that the perception of entwinement is not enough. And there are two things I would point to. Brentwood Academy, the Court says specifically you must look at reality and not form. And in the Gannett case, which Mr. Daly cites for the proposition that the public's perception is relevant to the state action inquiry, the Court made a comment about this public's perception in the context of discussing the Burton symbiotic relationship test. However, as this Court knows, the Burton case has been narrowed and confined to its unique facts. You know, there are some comparable facts, though, because in Burton, the parking authority and the restaurant were sharing funds as a result of a determined action, which was discriminating against African Americans. But similarly here, wasn't the authority sharing some of the profits with HMS Host as a result of the challenge action? There are some similarities, Your Honor, but I would suggest that, first of all, you should not consider the Burton symbiotic relationship test. Two, I would say Burton has been narrowed to its unique facts. Three, I would say that there are some comparable facts. There are some comparable facts, but more recent precedent has said that the factors, many of the factors that the Burton court relied upon are no longer a basis for finding state action. And the courts have made clear that the critical element in Burton was that the complaint of conduct, that is, the refusal to serve African American customers, was indispensable to the operation of the collaboration between the state and the private entity. Despite the fact that Burton has been limited to its facts, in fact, Burton itself limited itself to, or self-referentially mentioned the limitation of its peculiar facts. But that aside, either test, pervasive employment, or what's been characterized as symbiotic pursuant to Burton, are exquisitely fact-sensitive tests, aren't they? That's correct. So following up then on Judge Fuente's question, if we have, as we had in Burton, a recognition of the fact that profits or revenues, perhaps derived from the sale of food at the restaurant, were enhanced because of the discriminatory conduct of the owner and operator of the restaurant, i.e., the owner simply wanted to have only white customers there. And here we have reflected a desire not to upset patrons of the plaza for fear that they otherwise might not patronize the plaza. Aren't we really talking about the same thing? About an impact on the flow of revenues to host, in our case, or to the restaurant in Burton? No, Your Honor, I don't think we are. And that is because in Burton, the complaint of conduct, the discrimination based on race, was indispensable to the success of the enterprise. Here, hosts' unilateral decision, made without any input from the authorities, to exclude a single commercial brochure from the brochure ranks, cannot have been indispensable to the financial success of the service plazas, such as to convert host's conduct, private conduct, into state action. And I would say the record has nothing in it to say that the removal of the single brochure had any financial impact on hosts or the authorities, much less was indispensable to the success. And I would say that, you know, while it's conceivable that a racially integrated restaurant in 1961 would not have survived, it is hard to imagine that so many travelers would be offended by the bare exposure brochure as to scuttle the success of the service plazas had it remained in the brochure ranks. And I would suggest that recent authority, including Christman, suggests that the private leasing of public space, the sharing of profits with the state, even the subsidization by the state of the private entity's enterprise, is not sufficient to constitute state action. Isn't there a sign where the brochure is replaced saying that the display racks be general admission and open to the public at large? There was something in the contract between host and CTM Media. This contract between HMS host and? And CTM Media, the vendor. And the reason we raise that point is that technically host had the right to object to the bare exposure brochure because it limited access to the Gentleman's Nightclub to people who were 18 years or older. It was not general admission. And that language was not with the consideration of the authority? No, the authorities were not a party to the contract between host and CTM Media. And there's no evidence in the record that they reviewed the contract, that they approved the contract, that they controlled the contract. In fact, the evidence is undisputed that the contract between the authorities and host was utterly silent as to the placement of brochures in the racks and that there was no evidence that the authorities ever directed HMS host with respect to the placement of brochures. I suspect under First Amendment doctrine they probably couldn't. That is, the authority could not tell HMS host what it could display and what it could not display. That's correct, Your Honor. I would like to return to the perception point. So Mr. Daley argues that a visitor coming into the service plazas might think that the state runs the service plazas. It's a good argument, though, I think, because if you've been on that roadway and you see New Jersey Turnpike and this is a service center, there are signs all over that seem to involve that facility with the state, the state of New Jersey. I don't know if Pennsylvania is the same way, but I suspect you'll see signs for maybe Pennsylvania State Police and so forth. I think, Your Honor, it would be hard for us to find any case that supports the proposition that the public's perception of entwinement is enough. And I would respectfully suggest in the Gannett Court this Court rejected that very notion. It said it really rejected out of hand any danger that the public would attribute the conduct of the concessionary. All right, so you need something more than perception. Absolutely you need something more. It has to be actual entwinement in the management or control of the private entity. Well, one of the incidents, if you will, of entwinement that is argued by your opponent is the looming presence of portraits of the governor and Senator Farley. What do you make of that? And number two, unless I missed something, I didn't see any provision in the contract that required Host to do that. I don't remember any provision in the contract that required that either, Your Honor. And once again, I don't think there's any support for the proposition that perception is enough. In the Gannett case, which involved the Newark International Airport, presumably there were governmental messages, legal notices, photographs of public officials, and the Court didn't see any risk that the public would attribute the actions of the private concessionaires who were leasing the newsstands to the Port Authority. And I would respectfully suggest that the same is true here, that there's no danger that the public would perceive it. And even if they did, it's not enough under the law. And I think the district court was correct in finding that there was nothing beyond mere argument to support the proposition that a reasonable person would think that all the messages were communicated by the state. They did not submit any consumer surveys. They really just made the bald assertion. And it's a little absurd for a person to think that the state is the sole source of brochures about local restaurants, local venues, when they're side-by-side with national chains in the context of the service plaza. So I think both the law does not support perception as entwinement, and I think the facts do not support that a reasonable person would think that this was the service plazas were run by the state. Is it true that there's an information booth inside the service plaza that is for the public, or is it something that is run at the behest of the state? In one of the plazas, the Farley Plaza, I believe there is an information booth that was set up by the state. By the state? That's correct. And it is serviced by state employees? I believe that's correct. I would also point to the fact that there is case law out there suggesting that highway rest stops and service plazas are neither public for nor designated public for. We cited those in our reply in support of the summary judgment motion below in response to the public function test. And I would direct your attention to those. Those appear at pages, I think, 14 through 17 of our reply brief, 15 through 17. Specifically, federal courts have uniformly held that highway rest areas are neither traditional nor designated public for or. Okay, Ms. Bonsell, if there's nothing further. Okay, thank you, Your Honor. We'll take your argument into account and get back to Mr. Daly. Mr. Daly? Yes, just briefly. As Judge Smith pointed out, these are very fact-sensitive cases. And a couple of the facts in the GATTA case, in the Newark Airport case, factual difference. The patrons of the airport are patrons of the airlines. The airlines are private entities. That's why they're going to the airport. In this case, virtually every patron who walked into the rest area is a toll-paying patron of the governmental entity. It's a toll as it paid to use the highway. And because of that, you say that the authorities are involved in state action for incidents that occur? I'm not saying solely because of that. I'm saying that this is another fact going into the overall residuum of facts involved in making the normative judgment as to whether state action should be applied in this case. I am getting the impression, Mr. Daly, that your strongest argument is the one involving perception. And now you've added another one, which is that the patrons of the service plazas pay a toll. Is that accurate? Is there something more, then, that we should consider than perception and the payment of a toll? Well, the economic factors, the perception factor, the overall situation of who are the patrons of HMS. You do not argue that the state is entwined in any way with the operation of the service plaza? Well, they are entwined, or HMS is entwined with the state to the extent that HMS is entwined enough that it doesn't have to pay local real estate taxes, which is why I brought up the Atkins case of the New Jersey Supreme Court that held that they did not. The fact that the state provides a tax exemption or a tax benefit to a private entity doesn't mean that it's entwined with that. Not at all, but that's not the situation here. This isn't the situation where the legislature said this category of private businesses will receive a tax benefit. This is a situation where the New Jersey Supreme Court, analyzing the situation, said the function that is being performed here is the equivalent is so close to what the authorities are given the duty to engage in that the private entity that does this portion, providing this portion of the services that the authorities are to provide, it doesn't have to pay local real estate taxes. Very good. Mr. Daly, thank you very much for your argument, and Ms. Blesso, thank you also.